IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ALISA M. GORCHOCK** as Administratrix of THE ESTATE OF JOHN M. GORCHOCK and In Her Own Right, | ) ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | 2:19cv1323 **Electronic Filing** |
| **URS CORPORATION - OHIO** and **ABC CORPORATIONS (1-10)** | ) ) ) | |
| Defendants. | ) | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | | |
|---|---|---|
| **KERRI ANN BACHNER** as Administratrix of THE ESTATE OF KEVIN PATRICK BACHNER and In Her Own Right, | ) ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | 2:19cv1324 **Electronic Filing** |
| **URS CORPORATION - OHIO** and **ABC CORPORATIONS (1-10)** | ) ) ) | |
| Defendants. | ) | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | | |
|---|---|---|
| **THOMAS CANTWELL,** | ) ) | |
| Plaintiff, | ) ) ) | 2:19cv1325 |
| v. | ) ) | **Electronic Filing** |
| **URS CORPORATION - OHIO** and **ABC CORPORATIONS (1-10)** | ) ) ) | |
| Defendants. | ) | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MICHAEL GORCHOCK,                    )
                                     )
              Plaintiff,             )
                                     )
       v.                            )          2:19cv1329
                                     )          **Electronic Filing**
URS CORPORATION - OHIO               )
and **ABC CORPORATIONS (1-10)**      )
                                     )
              Defendants.            )
                                     )
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## <u>OPINION</u>

Plaintiffs commenced these personal injury/wrongful death actions seeking redress from URS Corporation – Ohio ("URS") and one or more of its subsidiaries for injuries and damages sustained as a result of a work-related event that occurred at a power plant owed by FirstEnergy Corporation, FirstEnergy Generation LLC, and/or FirstEnergy Generation Mansfield Unit 1 Corporation ("FirstEnergy"). URS entered into a contract with FirstEnergy to design and construct a facility at the power plant. Plaintiffs' claims are predicated on the contention that 1) URS failed to perform its contractual obligations in a manner that breached a duty of care under Pennsylvania law and 2) the breach was a substantial factor in causing their injuries and losses. Presently before the court are defendants' motion to dismiss. For the reasons set forth below, the motions will be denied.

It is well-settled that in reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "[t]he applicable standard of review requires the court to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view

them in the light most favorable to the non-moving party." Rocks v. City of Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989). Under the Supreme Court's decision in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 561 (2007), dismissal of a complaint pursuant to Rule 12(b)(6) is proper only where the averments of the complaint plausibly fail to raise directly or inferentially the material elements necessary to obtain relief under a viable legal theory of recovery. Id. at 544. In other words, the allegations of the complaint must be grounded in enough of a factual basis to move the claim from the realm of mere possibility to one that shows entitlement by presenting "a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. In contrast, pleading facts that only offer "'labels or conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" nor will advancing only factual allegations that are "'merely consistent with' a defendant's liability." Id. Similarly, tendering only "naked assertions" that are devoid of "further factual enhancement" falls short of presenting sufficient factual content to permit an inference that what has been presented is more than a mere possibility of misconduct. Id. at 1949-50; see also Twombly, 550 U.S. at 563 n. 8 (A complaint states a claim where its factual averments sufficiently raise a "'reasonably founded hope that the [discovery] process will reveal relevant evidence' to support the claim.") (quoting Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 347 (2005) & Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 741 (1975)); accord Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997) (a court need not credit "bald assertions" or "legal conclusions" in assessing a motion to dismiss) (citing with approval Charles Alan Wright & Arthur R. Miller, FEDERAL

PRACTICE AND PROCEDURE § 1357 (2d ed. 1997) ("courts, when examining 12(b)(6) motions, have rejected 'legal conclusions,' 'unsupported conclusions,' 'unwarranted inferences,' 'unwarranted deductions,' 'footless conclusions of law,' or 'sweeping legal conclusions cast in the form of factual allegations.'").

This is not to be understood as imposing a probability standard at the pleading stage. Iqbal, 556 U.S. at 678 ("'The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.'"); Phillips v. County of Allegheny, 515 F.3d 224, 235 (3d Cir. 2008) (same).  Instead, "[t]he Supreme Court's Twombly formulation of the pleading standard can be summed up thus: 'stating ... a claim requires a complaint with enough factual matter (taken as true) to suggest the required element ... [and provides] enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.'"  Phillips, 515 F.3d at 235; see also Wilkerson v. New Media Technology Charter School Inc., 522 F.3d 315, 321 (3d Cir. 2008) ("'The complaint must state 'enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.'") (quoting Phillips, 515 F.3d at 235) (citations omitted).  "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."  Twombly, 550 U.S. at 563.

Here, plaintiffs allege that Thomas Cantwell, Michael Gorchock and decedents John Gorchock and Kevin Bachner were employees of a subcontractor of FirstEnergy known as Enerfab ("the employees") and were at FirstEnergy's Mansfield electric power-generating plant

performing maintenance work at the invitation of FirstEnergy.   Amended Complaint at ¶¶ 25-26.[1]   FirstEnergy's Mansfield Plant produces electricity from burning coal.  Id. at ¶¶ 13-14.

Producing electricity in this manner requires that the coal first be scrubbed with a chemical solution in order to reduce sulfur dioxide emissions.  Id. at ¶ 14.  A coal ash byproduct is generated as part of this process.

Sulfur is one of several components in the coal ash byproduct.  Others are water, fly ash and lime.  Id.  The presence of sulfur is known to promote the presence of sulfur reducing bacteria.  Sulfur reducing bacteria are known to reduce inorganic sulfur compounds such as sulfite, thiosulfate and/or elemental sulfur to the poisonous gas known as hydrogen sulfide.  Id. at ¶¶ 14, 30, 40-42.

During the third shift on August 29, 2017, the employees were working at the plant in a partially enclosed and partially underground structure while attempting to remove an elbow joint from a pipe within the structure.  They were instructed that the pipe contained only water.  During the work a circuit breaker tripped, resulting in a power outage.  Cantwell got out of the structure and restored the power.  Id. at ¶¶ 26-29.  "Immediately after Mr. Cantwell climbed out of the structure, a noxious, dangerous and/or poisonous gas believed to be hydrogen sulfide was released from the subject pipe."  Id. at ¶ 30.

The release of the gas placed all workers in the vicinity in danger and upon Cantwell's return the other workers were screaming and exhibiting signs of ensuing distress.  Kevin Bachner and John Gorchock were unable to escape from the structure and either died from exposure to the gas or downed at the bottom of the structure after being rendered unconscious from the gas.

---

[1]  Plaintiffs' complaints contain substantially similar allegations.  The court's citations are to the Amended Complaint in Alisa M. Gorchock, as Administrix of the Estate of John M. Gorchock, v. URS Corporation – Ohio, et al., 2:19cv1323 (Doc. No. 16) ("Amended Complaint").

Cantwell lost consciousness while attempting to rescue Nathanial Compton as he was attempting to climb out of the structure.  Cantwell, Michael Gorchock and Nathaniel Compton were found outside the structure and taken to local hospitals for treatment.  Id. at ¶¶ 31-35.

Defendants were retained by FirstEnergy to serve as professional engineers and construction contractors for the erection of a dewatering facility at the Mansfield Plant.  Id. at ¶ 18.  URS and/or one its wholly owned subsidiaries was responsible for building the facility.  Id. at ¶ 19.  URS performed design, engineering and/or construction services in the process of constructing the dewatering facility.  Id. at 38.

FirstEnergy entered into this contract for erection of the facility after it and the Pennsylvania Department of Environmental Protection entered a Consent Decree mandating that FirstEnergy cease using a coal ash pond known as Little Blue Run in disposing of coal ash byproduct or slurry.  FirstEnergy was given five years under the consent decree to develop an alternative means of disposing of the coal ash waste.  Id. at ¶¶ 13-15.  The dewatering facility was the means by which FirstEnergy intended to treat the coal ash byproduct in order to then be able to transport the waste to an offsite location.  Id. at ¶ 16.  It was intended that the facility be capable of processing between 2.5 and 3.5 million tons of coal ash byproduct annually.  Id. at ¶ 17.

The dewatering facility designed and constructed by defendants was placed into service in January of 2017.  During the following eight months the facility often was rendered nonfunctional due to technical issues.  When rendered nonoperational, the coal ash byproduct could not be treated and/or removed from the Mansfield Plant.  Id. at ¶¶ 20-23.

As the engineer for the dewatering facility, URS and the other defendants working in conjunction with it knew or should have known of the sulfur in the coal ash byproduct and the

6

likelihood that sulfur reducing bacteria would become present and reduce the inorganic sulfur compounds into hydrogen sulfide.  As professionals in this area these defendants further knew or should have known of the substantial risk of harm or death posed by the presence of hydrogen sulfide.  Id. at ¶¶ 38-42.

URS and the defendants working in conjunction with it were negligent and failed to meet the professional standards of care in the engineering, design and architectural industry and deviated from the professional standards in the engineering industry.  These failures and deviations caused the injuries sustained by plaintiffs.  Id. at ¶¶ 39, 43.  Among other failures and/or deviations, these defendants failed to design and construct a dewatering plant that 1) was functional and fit for its intended purpose, id. at ¶ 44(b), 2) was designed to mitigate or prevent the development of hydrogen sulfide gas at the Mansfield Plant, id. at ¶ 44(d), 3) contained alternative protocols for safely operating the Plant and handling the coal ash byproduct in the event the  dewatering facility became nonoperational, id. at ¶ ¶44(f)-(g), 4) provided for the detection, warning and/or monitoring of the presence of hydrogen sulfide and/or the conditions that were known to produce hydrogen sulfide, id. at ¶¶ 44(h) – (k), and 5) was capable of meeting the demand generated at the Plant and permitting the proper disposal of the coal ash byproduct, id. at ¶ 44(l).  In addition, defendants failed to warn about the risks presented by hydrogen sulfide, provide safety and rescue protocols that were based on and accounted for those risks, and train employees and supervisors about the risks.  Id. at ¶¶ 44(p), (r), (s) (u).  They likewise failed to hire employees, safety inspectors, contractors and subcontractors that were capable of meeting and managing these risks.  Id. at ¶ 44(v).  These acts and omissions were a substantial factor, played a causal role and/or otherwise increased the risk of the injuries and deaths alleged by plaintiffs.  Id. at ¶ 45.

URS seeks dismissal on the grounds that it, as an engineering contractor with FirstEnergy, did not owe any duty to plaintiffs. Citing to investigation reports by the Occupational Safety and Health Administration ("OSHA") generated after the accident and declarations by Plant officials, URS asserts that the employees were working at the "North LDS Pond Vault," which is a location distinctly separate from the dewatering facility and the "Surge Pond," where the water from the coal ash byproduct is piped after the byproduct is processed at the dewatering facility. From URS's perspective, there has not been sufficient factual matters alleged to raise an inference that there is a logical connection between the work it undertook for FirstEnergy at a separate location in the Plant and plaintiffs/decedents being poisoned by hydrogen sulfide at the North LDS Pond Vault. Because there is no connection between the scope of work and the location of the accident, the attempt to invoke a duty of care fails as a matter of law. Furthermore, because plaintiffs supposedly were complete strangers to and had no relationship with URS, a duty to warn of any potential dangers or safety risks could not have arisen absent a specific undertaking of such a duty, which has not been alleged. Finally, URS maintains that because plaintiffs' claims are predicated on "the standard of care in the engineering, design and architectural industry," plaintiffs purportedly are required to establish privity of contract, which is absent as to Enerfab and/or its employees.

Citing to an array of information in OSHA reports and publications by experts and reporters, plaintiffs maintain that the allegations sufficiently link the failures of the facility to the assertedly foreseeable and ongoing accumulation of coal ash byproduct at the Plant, with no place or way to dispose of it and the resulting need to store it somewhere on Plant grounds. This state of affairs forced FirstEnergy to store the slurry in its holding ponds. And URS was aware that storage of the slurry in that manner created conditions that were ripe for the dangerous

creation of hydrogen sulfide. Under these circumstances, defendants assertedly owed a duty of care to third parties who would come in contact with the dangerous conditions that ensued from the failed dewatering facility and defendant's arguments to the contrary raise issues of causation that are being masqueraded as one of duty. In addition, a showing of privity is not required by Pennsylvania for the type of professional negligence claim presented, and the duty defendant owed to those foreseeably harmed by its conduct has been settled since Palsgraff v. Long Island Railroad, 162 N.E. 99 (N.Y. 1928), was decided. Thus, plaintiffs maintain that their complaints are not vulnerable to defendants' pre-discovery attack.

Defendants' contention that URS could not have owed a duty of care to plaintiffs/decedents under the factual averments advanced is misplaced. Pennsylvania employs an analysis that focuses on the nature of the duty alleged to have been breached in identifying the demarcation between various causes of action that may be advanced in a civil action. Bruno v. Erie Ins. Co., 106 A.3d 48, 69 (Pa. 2014). And in drawing distinctions between claims that may progress at the pleading stage under various causes of action, the allegations comprising the claims in a plaintiff's complaint are of paramount importance. Id. at 68, 69.

Moreover, the Supreme Court of Pennsylvania "has long recognized that a party to a contract may be found liable in tort for negligently performing contractual obligations and thereby causing injury or other harm to another contracting party, see, e.g., Bloomsburg Mills v. Sordoni, 401 Pa. 358, 164 A.2d 201 (1960) (finding evidence sufficient for jury to have concluded architect was negligent in failing to exercise reasonable care in performance of duties imposed by design contract), or to a third person, see, e.g., Evans [v. Otis Elevator, Co., 403 Pa. 13, 18, 168 A.2d 573, 575 (Pa. 1961)] (elevator repair company liable for injuries to user of the elevator caused by its negligent performance of service contract with building owner); Farabaugh

v. Pa. Turnpike Comm'n, 590 Pa. 46, 911 A.2d 1264 (2006) (recognizing claim for negligence against construction company for injuries to a third person caused by company's allegedly deficient performance of its contractual duty of inspection)." Bruno, 106 A.3d at 69-70.

Where the nature and source of the duty gives rise to such a claim, "a negligence claim based on the actions of a contracting party in performing contractual obligations is not viewed as an action on the underlying contract itself, since it is not founded on the breach of any of the specific executory promises which comprise the contract.  Instead, the contract is regarded merely as the vehicle, or mechanism, which established the relationship between the parties, during which the tort of negligence was committed." Id. at 70 (citing Zell v. Arnold, 2 Pen. & W. 292, 1830 WL 3261, at * 3 (Pa. 1830) (considering action to be in tort since it was for breach of the defendant's duty to perform, in a "workmanly manner," construction activities specified by the construction contract); Evans, 168 A.2d at 575 ("It is not the contract *per se* which creates the duty [to avoid causing injury to third parties]; it is the law which imposes the duty . . . ."); and Reitmeyer v. Sprecher, 243 A.2d 395 (Pa. 1968) (negligence action was based on landlord's alleged breach of his independent duty of care imposed by law, which arose because of the parties' establishment of a contractual relationship through the formation of the lease agreement, not for a breach of a duty created by the agreement itself).

A general duty to exercise reasonable care to avoid injury to third parties may devolve upon a contracting party in at least two ways.  First, such a duty can be delegated or otherwise assumed as part of the contractual undertaking itself.  Farabaugh, 911 A.2d at 1281, 1283 (construction manager, who occupied a role "similar to that of an architect," assumed sufficient obligations in inspecting and supervising the safety procedures of the overall construction project to give rise to a general duty to exercise reasonable care and perform the contractual obligations

so as to avoid injury to third-parties).  Second, the very nature of the contractual undertaking may give rise to such a duty.  Id. at 1283 ("a party to a contract by the very nature of his contractual undertaking may place himself in such a position that the law will impose upon him a duty to perform his contractual undertaking in such manner that third persons - strangers to the contract - will not be injured thereby; Prosser, Torts (2nd ed.1955), § 85, pp. 514–519).  It is not the contract *per se* which creates the duty; it is the law which imposes the duty because of the nature of the undertaking in the contract.") (quoting Otis Elevator, 168 A.2d at 575).  In either event, "[t]he extent of the duty and the subsequent questions of breach and causation" are informed "by 'the nature and scope of [the] contractual undertaking."  Farabaugh, 911 A.2d at 1284 (citing Otis Elevator, 168 A.2d at 576).

When in completing a contractual obligation it is reasonably foreseeable that a normal and natural result of the failure to perform the undertaking in a proper manner might result in injury to others who are on or will be coming into contact with premises, the imposed duty arises.  Otis Elevator, 168 A.2d at 576; Farabaugh, 911 A.2d at 1283-84.  Where applicable, an assumed or otherwise imposed general duty of care is owed to such individuals "regardless of any privity of contract."  Otis Elevator, 168 A.2d at 576 (collecting cases); Farabaugh, 911 A.2d at 1283.

The principles of law emerging from Bloomsburg Mills and Otis Elevator consistently have been tenants of Pennsylvania law.  Bruno, 106 A.3d at 69-70; Farabaugh, 911 A.2d at 1283.  The duty articulated in these seminal cases "has been formalized in Section 324A of the Restatement [(Second) of Torts]."  Farabaugh, 911 A.2d at 1283.  Consistent with these longstanding precedents, the Supreme Court of Pennsylvania has applied Section 324A, noting

that "the essential provisions of this section have been the law in Pennsylvania for many years." Id. (quoting Cantwell v. Allegheny County, 483 A.2d 1350 (Pa. 1984)).[2]

Here, plaintiffs have presented sufficient allegations to proceed with their claims based on a general duty of care imposed by law.  URS's contractual undertakings were centered on designing and constructing a facility to handle and process substances which are hazardous to the environment and human health.  FirstEnergy's generation and disposal of the coal ash byproduct became the subject of scrutiny by the Pennsylvania Department of Environmental Protection prior to 2012.  See Comm. of Pa. Dept. of Environmental Protection v. FirstEnergy, 2:12cv1061 at Complaint (Doc. No. 1 in 2:12cv1061).  The DEP exercised its public mandate in order to eradicate the ongoing unsafe disposal of this byproduct and develop an acceptable means of disposing of the waste.  Amended Complaint at ¶ 26; Consent Decree of Dec. 17, 2012 (Doc. No. 7 in 2:12cv1061) at ¶¶ h, l.

---

[2] This section provides:

§ 324A. Liability To Third Person For Negligent Performance Of Undertaking

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

RESTATEMENT (SECOND) OF TORTS § 324A.

Given the public concern and governmental regulation underlying the contractual undertaking, the nature of the contract is one that gave rise to a general duty to exercise reasonable care to perform its obligations in a manner that would avoid injury to third parties. Against this backdrop it is alleged as a matter of fact that the coal ash byproduct contained substances that were hazardous and, if left in an unprocessed form, were particularly known to undergo a natural decomposition process that would result in the presence of the gas causing plaintiffs' injuries/ decedents' demise. Amended Complaint at ¶¶ 14, 40-42; see also Consent Decree at ¶ k(ii) (mandating ongoing monitoring for hydrogen sulfide at Little Blue Run residual waste impoundment). It is likewise alleged that as professional architects and construction contractors in this arena, defendants knew or should have known of these potential risks of harm. Amended Complaint at ¶¶ 40-42.

It further is alleged that the dewatering facility was designed and constructed in a manner that fell short of an acceptable, functional facility that was fit for its intended purpose. This assertion is accompanied by the allegation of fact that during the first eight months of operation the facility failed to operate on any meaningful level. And during this time much of the anticipated 1.6 to 2.3 million tons of byproduct was produced without a proper means of storage and/or disposal. Pursuant to the consent decree FirstEnergy was prohibited from disposing of the substances through the method that previously had been used or any other unapproved methods. Consent Decree at ¶¶ h, i, l. And it is alleged as fact that as a result of these factual occurrences FirstEnergy had no way of disposing of its coal ash byproduct.

The consent decree was needed due to the presence of hazardous environmental conditions created by dumping the slurry in a 1,700 acre holding pond. There were numerous ways in which the substances posed an ongoing threat to human health and the environment at

the impoundment and in the surrounding area.   It thus is fairly evident that the hazard to human

health created from the byproduct was not contained merely by untreated storage.   One of the

human hazards potentially created by the unprocessed storage of the waste in the form of a slurry

was the formation of hydrogen sulfide.   It is alleged that the coal ash byproduct was being

generated for months at the Plant without a means of disposal.   It is reasonably foreseeable that a

significant accumulation of the byproduct would create a risk of physical harm or injury to others

who might be at the location where it was being stored and/or at a location where its remnants

might be found to have migrated if the slurry was left to disperse/deteriorate over time.[3]

The nature of defendants' contractual undertaking is such that a general duty to use

reasonable care to avoid injury to others devolved upon them as a matter of law.   This duty

existed without regard to privity of contract.   Plaintiffs were invitees of FirstEnergy whose

presence at the Plant and work in and around the vicinity where the byproduct was stored or its

---

[3]  Recognizing that defendants owed this level of duty with regard to their undertakings at the
plant sufficiently undercuts their contention that any duty was limited to contractual obligations
and/or it was unforeseeable that any contractual failure on their part would create an
unreasonable risk of harm or increase such a risk to third parties at locations at the plant that
were distinct from the dewatering facility.   It has long been settled in Pennsylvania and
elsewhere that "[o]nly when the question of foreseeability is undeniably clear may a court rule as
a matter of law that a particular defendant did not have a duty to a particular plaintiff." Alumni
Ass'n, Delta Zeta Zeta of Lamdi Chi Alpha Fraternity v. Sullivan, 535 A.2d 1095, 1098 (Pa.
Super. Ct. 1987) (citing Migyanko v. Thistlewaite, 419 A.2d 12, 14 (Pa. Super. Ct.1980) and
Palsgraf, 162 N.E. at 100); cf. Mountz v. Lebanon County, 45 Pa. D. & C.2d 355, 361 (Ct. of
Com. Pleas, Leb. Cnty. 1968) (recounting the development of foreseeability in negligence
actions after MacPherson v. Buick Motor Co., 111 N. E. 1050 (N.Y. 1916), noting that it is the
foreseeability of injury to others that provides the proper scope of liability and opining that while
"the orbit of an architect's or contractor's duty to third persons is measured by the nature and
scope of his contractual undertaking with the owner, [] if, in the performance of those duties, he
is negligent and injury to third parties is foreseeable, the architect or the contractor would be
liable to the third person, regardless of the lack of privity of contract.").   Defendants' motions fall
far short of establishing such a showing.   Consequently, it follows that any further analysis
concerning the legal boundaries of foreseeability must await full development of the record.

remnants could have migrated was foreseeable.  Thus, defendants were obligated to perform their contractual obligations in a manner that fulfilled a general duty of care to plaintiffs.

Having found this general duty, it is unnecessary to venture into the foray raised by both parties' retreat to certain selected information in the public domain pertaining to the contract and the events that resulted in the injuries and deaths underlying plaintiffs' complaints.  Indeed, a mere cross-comparison of each parties' efforts in this regard convincingly confirms the wisdom of notice pleading under the Federal Rules of Civil Procedure and the underlying tenant that cases making a plausible showing of entitlement to relief should be adjudicated on their merits after the benefit of discovery.  In other words, "[t]he extent of the duty and the subsequent questions of breach and causation remain to be measured by 'the nature and scope of the [defendants' actual] contractual undertaking.'"  Farabaugh, 911 A.2d at 1284 (quoting Otis Elevator, 168 A.2d at 576).

For the reasons set forth above, defendants' motions to dismiss will be denied. Appropriate orders will follow.

Date: September 21, 2020

s/David Stewart Cercone
David Stewart Cercone
Senior United States District Judge

15

cc:    Brad D. Trust, Esquire
       Robert J. Fisher, Jr., Esquire
       David L. Kwass, Esquire
       Elizabeth A. Bailey, Esquire
       Robert J. Mongeluzzi, Esquire
       Lawrence E. Guerrera, Esquire
       Richard Urick, Esquire
       Amy Joseph Coles, Esquire
       Kevin M. Eddy, Esquire
       Ricky M. Guerra, Esquire
       Shawna J. English, Esquire

       (*Via CM/ECF Electronic Mail*)